Good morning, your honors. May it please the court, I'm J. Matthew for the petitioner, Mr. Goraya. If you could keep your voice up, please. Sure. As you are aware, Mr. Goraya was granted asylum by the immigration judge, only to have it revoked on the basis that there was fraud in the application. At the outset, it's critical to note that it was the government's burden of proof to prove by preponderance of the evidence that there was fraud in the petitioner's application, and the only evidence they presented was the testimony of Mr. Bassi. Well, no, we have the original application, and there's testimony of the petitioner who says there's a lot of stuff in it that wasn't true. Now, testimony is the stuff that wasn't true wasn't put there by me, but the first application contained a lot of stuff that wasn't true. Well, the only – I wouldn't say a lot of stuff, just in terms of his manner of entry and the letter from the Akali Dalman party. But in terms of the substance of his claim, his declaration of what happened to him, the persecution that happened in India, he all along said that that was true. So – and it is petitioner's contention that Mr. Bassi's testimony fails to rise to the level of substantial evidence to prove by preponderance of the evidence that there was fraud in the petitioner's application, because Bassi's testimony revealed that he had no actual knowledge of the way in which the petitioner's application was prepared. Now, once there's reopening – and I understand there may be an issue as to whether a reopening should have been allowed – but once there's reopening, do we just go back to square one, which is to say the question is, is there preponderance of the evidence to support the IJ's adverse credibility finding? Well, there was no adverse credibility finding in this case, because the judge granted him asylum to begin with, found him credible. No, no, I understand that. But once it's been reopened, assume we can get past the question as to whether reopening should have been allowed. Once it has been reopened, are we just back to an ordinary hearing in front of an IJ in which if there is substantial evidence to support the IJ's finding of non-credibility by the asylum seeker, that's the end of the story? No, I don't believe we're back in that position. I believe we're back – we're in the position which the regulations state, which is that the government – the burden is on the government to prove by preponderance of the evidence that there was fraud in the application. Okay. And if you look at the IJ's decision, she never makes any credibility finding, even in her second decision regarding the petitioner. She just says there's – I believe there was fraud in the application. Okay. So I don't believe preponderance of the evidence is a standard that is more probable than not. Mr. Busty's testimony is so weak, unreliable, basically conjecture and speculation as to what Mr. Mugler said, that it is – it does not prove that it's more probable than not. You know, counsel, I appreciate the fact you're an able advocate, and I admire your being able to get up here with a straight face and talk about some of this stuff. But, I mean, you're talking about your client who hired a guy that concocted, out of whole cloth, this elaborate story, which, ironically, he did for the same – almost identical, word for word, in hundreds of cases. And your client, you know, was admitted, no problem, based upon this false declaration. The government then later on prosecutes this Mr. Bossie. They find your client's records in his documentation, shows it was all a fraud. Bossie gets upset. The whole thing's a fraud. I made this whole thing up, and all these other people have done it. And your client's one of them. And now you're here telling us that your client has been mistreated because the IJ didn't do this or the IJ didn't do that, but your client admits that what was stated under oath was a lie from the beginning. So how does this square? How are we supposed to now say that the IJ did not have substantial evidence to show that this was a fraud? Well, I would – first of all, there was no other evidence besides Mr. Bossie's testimony. But that's all you need. This is the perpetrator. This is the man – he and his partner concocted all this stuff. I know your client maybe didn't concoct it all, but he signed it. He signed it. He said this is true. He then later on agreed it wasn't true. What more do you need? I understand. I think this case is different from the previous case. I understand. My client never said that he concocted the story. He from all along said that – So he agreed that every part of what he signed before was true and correct? Is that what you're saying? Except for the part in terms of the manner of entry, which he did disclose to the immigration judge at his first hearing. You say that's the only thing he said? That's the only thing that he said was not true was that Mr. Bossie changed that to say he entered without inspection, when in fact he had entered on – What about the testimony about being persecuted? He all along said that that was true. He never said that that was concocted. Bossie said he made it up out of whole cloth. Well, Mr. Bossie actually said he didn't know who prepared the application. He said the story was made up out of whole cloth. It was just completely fabricated. And it's the very same story. Almost word for word is used in hundreds of other cases. Well, we don't have any evidence in the record about what was in those other cases. So – We have the evidence that Mr. Bossie testified, I believe, that this same story was used in hundreds of other cases, do we not? I don't think he testified like that. He just – he only testified that he read the application – he read the story and he just said, well, this part is not true. This part is not true. But he never said that this is identical to what I've written in hundreds of other stories. But when you actually look at Mr. Grier's testimony, even before Mr. Bossie was arrested, he all along said, I told – it looks like he told Mr. Mully what had happened, and Mr. Mully wrote it down, and then they produced my declaration based on what I told them. And I believe that's in part of the record. I think it's 223 or 224 of the record. And so – so, yeah. So the only – Mr. Bossie's testimony, again, he's – when he does say I – this story is concocted, he's just speaking generally. This is what we generally do. No, he's talking about your client. Your client's records were found in his office. That file was found in the office. And he testified about that, did he not? Yes, he did. But there's nothing in that file to show that it was fabricated. When he says I made an application – No, Bossie testified that it was fabricated. Bossie testified that it was fabricated. But if you probe him on cross-exam when he was asked, well, did you prepare the application? He said no. Oh, I don't remember. Does that matter? If the story is false and it goes to the very heart of your client's claim about being persecuted, Bossie, who made it up, says it's false, your client signed a false declaration, what more do we need? What more we need is his actually basis of knowledge for knowing – for making that assertion. And in his cross-exam, he reveals that he has no basis of knowledge for making that assertion because it was, in fact, Mr. Mully. So if Mr. Bali says that your client is the tooth fairy and he signs it and your client signs the declaration, I'm the tooth fairy, and then Mr. Bali comes along and says there is no tooth fairy and I made it up all along, and your client says, no, I'm the tooth fairy, is that enough to satisfy it? Well, in terms of whether – I mean, obviously, there's some stories that are obviously too unbelievable that nobody can believe. But I don't think this is one of the cases. And even Mr. Bossie says in his testimony that some of these cases are true. I would reserve – some of the cases from Punjab are true, and I reserve the rest of the time for rebuttal. Thank you. May it please the Court, good morning. I'm Lyle Gents for the government. And if I could ask you to keep your voice up also. Yes, Your Honor. That might help a little. Us short guys have problems. The immigration judge acted well within her discretion in granting the government's motion to reopen here. What she had was not just the plea agreements that Bossie and Mully had signed plus Bossie's declaration that said he made this up. There was a lot from the original hearing which supported this. For instance, Mr. Garaja testified at his original hearing that Bossie filled out his asylum application. So we know Bossie was involved. He testified that – and that's at A.R. 222 to 223. Bossie had him sign a blank form. That's at A.R. 223. The man who was supposed to have prepared the application, Amarjid Singh, Mr. Garaja testified that Bossie did that and that Singh never signed, and that Singh had nothing to do with this. That's at page 223. Most importantly, Garaja testified that Bossie wrote his declaration. That's at A.R. 224 to 225. That Bossie accompanied him to the asylum interview and translated for him, and that Bossie put incorrect data on the asylum application and then coached him, telling him he'd have to testify that whatever was on the form was accurate and that Garaja, in fact, did so. This evoked an exclamation from the immigration judge. This, by the way, is at 234 of the record. But the immigration judge could not find sufficient inconsistencies at that time, based on all this, to nevertheless find that he was not credible. She did find some, and it's more than just the declaration. There was a birth certificate that had the father's name on it, and the father's name was incorrect. The immigration judge was very suspicious about that. There was a marriage certificate that looked like it had been tampered with. There was a driver's license. Garaja testified that he was from Bombay, that he was part of his father's trucking enterprise. His driver's license was for a motorcycle and for a light vehicle. Eventually, it got renewed to being a heavy truck. But when they looked very closely at that, at the time it was renewed, Garaja was in hiding, based on what he's claiming was his – was the persecution. So he didn't need it renewed. Moreover, the application, the driver's license was good to 2018. So there was no reason for it to have been renewed. The immigration judge focused on all that. He said there's a lot of problems here just to start with. Let me ask you this. This is a rare case. I've never seen one quite like this in a whole lot of ways. But the one I have in mind is ordinarily, of course, is the asylum seeker who has failed, who seeks to reopen. And the asylum seeker, in order to have a proper motion, one that will prevail, has to show not only new evidence that will make a material difference, but it has to have been unavailable at the time of the earlier hearing. Now, sauce for the goose, sauce for the gander, I mean, the government has to say that it wasn't available. What do we know as to what the government either knew or could have known? Because the question for available is could have known at the time of the original hearing, because we now get lots of evidence of fraud. So the question I have, in a sense, is the question I asked before, but now it's relevant instead of just sort of idle curiosity. What put the government onto this fraud? What did they know at the time of the hearing and so on? We don't know exactly that. But we do know that the government's investigation started the very first day of the beginning, December 24th, 2002, one day after Garager was granted asylum. And do we know if it was because of Mr. Garager's case? If it was one day after, I rather doubt it was because of his case. No. There's nothing in the record to describe that. As I read the record, my inference is that they had ample reason to suspect they probably had the investigation sort of in the works, authorized or whatever, rather trying to figure out whether they were going to authorize it. If they were going to start it the very next day, somebody back there in the government was thinking about it. I think that's probably a failure. So what evidence did you present to the district, excuse me, to the IJ in support of the motion to reopen, that said, well, the information we're now seeking to present to you was not available? Well, not to say, because it's not the question of what we did know. It's what we could have known. But they could not even, taking, Your Honor, you know, exactly the way you're putting it, they could not have known till they'd seized the files, which happened three weeks later. And the exact date for that was, oh. January 15th, 2003. January 15th, 2003, which is two weeks later. The investigation was ongoing. Moreover, as we said in the brief, there's no way that we could have known what Singh – I'm sorry, what Bossie was going to tell us at that point in time as to any of this. We couldn't know till we found that file folder, which interestingly had all the personal data on Mr. Garagia and not one word on persecution. It stopped there. We couldn't have known any of that till we seized those files. We couldn't have gotten Mr. Bossie to testify without impugning his Fifth Amendment rights up until he'd been convicted. So there's a whole bunch of things. And do you know, I mean, this is not quite the same question now, and this becomes sort of an idle question, because I think you've answered my question specifically as to availability. What put the government onto this? It's not in the record. And I have the fourth case here. It's not in the record there either. So I just don't know why they believe this. I mean, I can speculate that a number of claims were very similar. Maybe they told the story about the Jeep one too many times. Yes. Or 15 too many times. But that's not this case. The bottom line here is that the immigration judge considered the evidence. There was nothing unfair about it. Mr. Bossie testified for over 200 pages in this record, 150 of which were cross-examination. She had the chance to observe him, to compare what he was saying with what was in that file, with what Bossie, with what, I'm sorry, Mr. Garagia had testified earlier. She had the chance to observe him with his demeanor. And she was — the wool was not pulled over her eyes. When she gave her decision, she said, I might even find that Mr. Bossie is despicable. She understood what he was. But the evidence was so compelling that she had to grant the motion to reopen. And Mr. Garagia has not shown that the evidence compels a contrary result. Therefore, it's the government's position this Court must affirm and deny the petition for review. I just want to be sure of one thing following up on Judge Fletcher's question. At Mr. Garagia's asylum hearing on December 23, 2002, no part of the government had any information from Mr. Bossie or had indeed indicated he was being investigated at that time, knew nothing about Garagia's relationship with Bossie and Mollie. Is that correct? No. Well, Garagia himself had testified that Bossie had helped him out. I understand that. But they — but forgive me, I'm misstating this.  But the government, the government did not know anything from its investigation about Bossie's and Mollie's fraud. They didn't know anything from that channel about any relationship, right? No. Not at that time. All right. Subject to your remaining questions, that will conclude my argument. Okay. Thank you. Thank you, Your Honor. You've saved — you've saved some time. Thank you. I would like to respond to certain characterizations of the record that Respondent's Counsel made. One thing is Respondent's mentioned that the record — in the record, according to the record, Bossie or Garagia testified that Bossie filled in the application. In fact, it's not very clear. Garagia only testified that he went to Mr. Bossie's office and someone there filled in his application. But he doesn't specifically say it was Mr. Bossie. In fact, he says — and this is in the December 23, 2002 hearing when he's granted asylum — that he was sitting in one place with someone next to him and Mr. Bossie was sitting over there. And then Mr. Bossie, when he testifies, he corroborates that story, saying that, yes, I was sitting over there while Mr. Mully and Garagia were sitting across from each other, and I don't know what they talked about. Did Mr. Garagia testify to the effect that Mr. Bossie went with him to the hearing and told him he needed to memorize what was in the form, in the statement, and he needed to testify accordingly in order to make it seem correct? No. In fact, what Bossie — all that Garagia testified was that when he saw the application and mentioned that he had entered without inspection at San Ysidro, California, he told Garagia — or he told someone — again, it's not exactly clear from the record — he told that that information was wrong. And then that — Okay, but I appreciate on the entry date, but I understand what you're saying. He said that somebody, not Bossie, filled this in. They filled in the story, not Mr. Garagia. So when Mr. Garagia went to the hearing, Mr. Bossie went with him, correct? And what did Mr. Garagia testify Mr. Bossie told him about what he needed to say vis-à-vis what had been prepared and signed by your client? So Garagia didn't testify anything about there being any coaching other than on this one specific thing about the entry. And that's the only thing he mentioned that Bossie told him he had to say. So he read this — he read this thing that had been prepared that he didn't prepare and for which he provided no information. He saw it for the first time, right? So you're saying that he didn't — he didn't read it, wasn't coached, that he needed to understand what was said there so that he would know what to say? No, because he did testify on his direct exam in December 2002 that he told somebody in Bossie's office what to write. So he already knew what was in the application. And he did mention that that guy — that after it was filed, somebody read it back to him in Punjabi so that he could understand it. And that's in his direct testimony. Okay. Thank you very much. The case of Garagia v. Holder is submitted for decision.
judges: Todd, Fletcher W. , Smith M.